LOUIS GUTH AND OTHERS v. CITY OF STAPLES.[1]

June 19, 1931.

No. 28,553.

*F. C. McGivern* and *Ryan, Ryan & Ryan,* for appellant.
*Mark & Barron,* for respondents.

[1]Reported in 237 N. W. 411.

DIBELL, J.

Action in equity asking that the court adjudge the rate charged plaintiff by the defendant for electric current to be excessive and discriminatory; that the court determine a specific rate to be a fair, adequate, and reasonable rate; that the defendant be restrained from charging in excess of the rate so determined; and that the defendant be enjoined from discontinuing the furnishing of electric current pending the determination of the action.

The defendant demurred to the complaint. The demurrer was overruled. The defendant appeals from the order overruling it.

The defendant city is a home rule city of the fourth class. It owns an electric plant. Its charter determines the fixing of rates, and the general conduct of the city's electrical plant is committed to a water and light commission. The charter gives the city no authority to furnish electric current to those outside the municipality. The plaintiffs are without the municipality.

By L. 1913, p. 110, c. 103, § 1, G. S. 1923 (1 Mason, 1927) § 1764, it is provided:

"That any city of this state now or hereafter owning an electric light and power plant and now or hereafter having a population of ten thousand (10,000) inhabitants or less, shall be authorized and empowered to enter into a contract or contracts for the purchase by such city of electricity for the purpose of operating such electric plant, upon such terms as may be approved by a two-thirds vote of all of the members of the governing body thereof; Provided, that such contract or contracts shall not be made to run for a period exceeding fifteen (15) years."

By L. 1915, p. 45, c. 34, § 1, 1 Mason, 1927, § 1765-1, it is provided:

"Any city of this state now or hereafter owning and operating an electric light and power plant for the production and distribution of electricity, and now or hereafter having a population of ten thousand (10,000) inhabitants, or less, shall be authorized and empowered to dispose of any surplus electricity so produced to private consumers desiring the same residing outside the corporate limits

of said city, at such rates and upon such terms as the city council, or other governing body of such city, may deem proper."

The purpose of the section first quoted is to permit a city of the designated class having an electric plant to purchase the current instead of manufacturing it; and of the section next quoted to permit it to dispose of surplus electricity to private consumers residing outside the city limits.

The city purchases its current from the Minnesota Power & Light Company. We agree with counsel for the plaintiffs, contrary to the contention of the city, that a city of the class stated may sell surplus electric current to those outside the city limits regardless of whether the city itself manufactures the current or purchases from another. This was the view of the trial court. It is entirely too narrow a view, under the language of the two statutes, that the legislature intended a distinction in the right to furnish electricity outside the city dependent upon whether the city manufactured or bought its current. It appears from the complaint that for several years the city has sold electric current to consumers residing near, but outside, the city limits. It is alleged that the plaintiffs reside nearer the city's switchboard than do a large proportion of the persons within the city; that the cost of distributing the current is not more and sometimes is less than the cost of distributing within the city; that the city has charged a rate within the city less than the rate without the city; and that the excess in charge is exorbitant and discriminatory. It is not claimed that the city discriminates among those residing outside of the city. The discrimination is between those residing without and those residing within.

It is not claimed that the city is not abiding by the terms of its contract or contracts with those outside; but it is sought to have the court enter upon a consideration of the relative cost to persons within and without the city and determine and fix an equitable rate. This is not what the statute has in view. It expressly provides that there may be a contract; that is, the municipality is given the power to contract to furnish current to those without the city. It

is not required to contract with them. It has not contracted with some and refused to contract with others; but the wrong which the plaintiffs claim it does is that it fixes different rates for city service and service outside the corporate limits.

That there may be a different charge between residents and outsiders is obvious. The city and its inhabitants have the burden and risk of operating the electric plant. The loss through damage or destruction of the plant by accident or by the elements falls upon the city. The nonresidents purchasing electric service bear no part of it. An accident resulting in personal injury or property damage through the fault of the city is paid by taxes levied upon property of the city—not by taxes on outside property. The city suffers from the natural depreciation in value of its plant. The adjacent territory does not share it. For these reasons, and others that perhaps might be assigned, there is justly a difference in rate to residents and to nonresidents, who pay for what they get with no attendant or contingent risks. The parties should meet on a fair basis, those outside the city realizing that they are at some disadvantage because they live outside and that they are relieved of some risks; and the city realizing, if the fact be so, that there is profit in extending the service which it must furnish its inhabitants. If upon fair consideration the parties cannot get together, the condition must remain as it is unless there be further legislation. Looking at it from afar, it seems that a solution by negotiation should not be difficult.

Order reversed.